IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| SEVEN SIGNATURES GENERAL PARTNERSHIP, | ) ) | CIVIL NO. 11-00500 JMS/RLP |
| | ) | ORDER (1) DENYING SEVEN |
| Petitioner, | ) | SIGNATURES GENERAL |
| | ) | PARTNERSHIP'S MOTION TO |
| vs. | ) | COMPEL ARBITRATION; AND |
| | ) | (2) GRANTING RESPONDENT |
| IRONGATE AZREP BW LLP, a | ) | IRONGATE AZREP BW LLP'S |
| Delaware limited liability company, | ) | MOTION TO DISMISS PETITION |
| | ) | FOR ORDER COMPELLING |
| Respondent. | ) | MEDIATION/ARBITRATION, OR, |
| | ) | IN THE ALTERNATIVE, FOR |
| _____ | ) | SUMMARY JUDGMENT |

**ORDER (1) DENYING SEVEN SIGNATURES GENERAL
PARTNERSHIP'S MOTION TO COMPEL ARBITRATION; AND
(2) GRANTING RESPONDENT IRONGATE AZREP BW LLP'S MOTION
TO DISMISS PETITION FOR ORDER COMPELLING
MEDIATION/ARBITRATION, OR, IN THE ALTERNATIVE, FOR
SUMMARY JUDGMENT**

## I. INTRODUCTION

On July 22, 2011, Petitioner Seven Signatures General Partnership

("Seven Signatures") filed a Petition in the First Circuit Court of the State of

Hawaii seeking to compel Respondent Irongate Azrep BW LLC ("Irongate") to

engage in mediation and/or arbitration regarding Irongate's purported termination

of the parties' agreement for Seven Signatures to purchase Unit 3509 at the Trump

International Hotel & Tower at Waikiki Beach Walk (the "Trump Hotel").

Irongate subsequently removed the Petition to this court.

Currently before the court is Seven Signatures' Motion to Compel Arbitration, and Irongate's Motion to Dismiss and/or for Summary Judgment. The parties' Motions raise the same basic issue -- whether the parties' dispute must be arbitrated. Based upon the following, the court finds that the parties' dispute is not subject to arbitration and therefore DENIES Seven Signatures' Motion to Compel Arbitration and GRANTS Irongate's Motion to Dismiss and/or for Summary Judgment.

## II. <u>BACKGROUND</u>

**A.    Factual Background**

Whether the parties agreed to arbitrate their dispute implicates two different agreements between the parties.

### 1.    *The Sales Contract*

On November 10, 2006, the parties executed a Sales Contract for Irongate to sell and Seven Signatures to purchase Unit 3509 at the Trump Hotel for a total purchase price of $2,909,465. *See* Doc. No. 11-2, Resp't Ex. A. Unit 3509 was one of 166 units that Seven Signatures contracted to purchase from Irongate with the intent to immediately resell at a profit. *See* Doc. No. 11-1, Jason Grosfeld Aff. ¶ 6. Seven Signatures' resale purchaser for Unit 3509 was Toranomon Kikaku

LLC, Doc. No. 15-4, Pet'r Ex. 3, which is headed by Masaaki Shintaku ("Mr. Shintaku"). *Id.* ¶ 6.

The Sales Contract for Unit 3509, drafted by Irongate, *see* Doc. No. 15-1, Yoichiro Nakano Decl. ¶ 7, provides for Seven Signatures to make two deposits, and then pay the remaining balance either sixty days before the scheduled or anticipated Closing Date, or, if paying a portion through a mortgage lender, then two business days before the scheduled Closing Date. *See* Doc. No. 11-2, Resp't Ex. A at 4 ¶ C. In Section D.10, the Sales Contract describes that Irongate may choose the Closing Date:

> The Closing Date shall be that date selected by Seller, in Seller's sole and absolute discretion; provided, however, that the Closing Date shall not be prior to the completion of construction of Purchaser's Unit as certified by the Project Architect. On the Closing Date, Seller and Purchaser shall be required to perform their respective obligations to sell and purchase the Unit under this Sales Contract. The parties agree that the Seller may extend the Closing Date in its sole discretion. . . .

*Id.* at 12 ¶ 10.

The Sales Contract further defines "Closing" versus "Closing Date:"

> "CLOSING" shall mean the transfer of the Unit from Seller to Purchaser by way of the filing of the Unit Deed upon payment by Purchaser to Seller of the Total Purchase Price.

> "CLOSING DATE" shall mean the date selected by

Seller, as described in **Section D.10** of this Sales
Contract, upon which Purchaser and Seller shall perform
their respective obligations to purchase and sell the Unit.

*Id.* at Ex. A.

In the event of default by Seven Signatures, the Sales Contract

provides:

Seller shall provide Purchaser with written notice of such
default or breach and the opportunity for purchaser to
remedy such default or breach within twenty (20) days
after the date of receipt of such notice.  If Purchaser has
not remedied such default or breach within such twenty
(20)-day period, Seller shall be entitled to any remedy
available in law or equity including, without limitation,
(I) specific performance of this Sales Contract and the
terms and conditions set forth therein; or (II) termination
of this Sales Contract upon written notice to purchaser
. . . .

*Id.* at 26 ¶ 37.

Finally, the Sales Contract includes an Alternative Dispute Resolution

Clause (the "ADR Clause").  But the ADR Clause also explains that actions or

claims between the parties regarding the subject matter of the Sales Contract which

occur before the Closing Date need not be resolved through ADR:

39.   Purpose and Exclusivity. The purpose of these
dispute notification and resolution procedures (the
"procedures") is to provide [the parties] with a
mechanism to resolve disputes that may develop in the
future concerning the subject matter of this Sales
Contract.  The parties agree that these procedures shall be

4

the exclusive method to resolve all disputes and that the goal of the parties in agreeing to these procedures is to ensure that all disputes are resolved in the most expeditious and inexpensive manner possible. All provisions of these procedures are to be interpreted with this purpose in mind.

        a.    <u>Definition</u>. "Disputes" means and includes any and all actions, claims or disputes by, between or among the parties . . . . Notwithstanding anything else in this section D.39 to the contrary, *any action or claim by or between Seller and Purchaser arising out of or incident to this Sales Contract that is raised or otherwise asserted before the Closing Date need not be submitted to alternative dispute resolution provided herein, and Seller and Purchaser shall be free to pursue such action or claim as otherwise provided herein, in proceedings before any court of competent jurisdiction.* Purchaser and Seller agree that any judicial proceedings initiated under the preceding sentence shall be conducted in Honolulu, Hawaii.

Doc. No. 11-2, Resp't Ex. A, ¶¶ 39, 39(a) (emphasis added).

### 2. *The Parties' Attempts at Closing and Negotiations of a Master Settlement Agreement*

Irongate originally scheduled the Closing Date for Unit 3509 on December 10, 2009. *See* Doc. No. 11-1, Grosfeld Aff. ¶ 7; Doc. No. 11-3, Resp't Ex. B. The parties subsequently agreed to move the Closing Date to the summer of 2010. *See* Doc. No. 11-1, Grosfeld Aff. ¶ 9; Doc. No. 22-4, Pet'r Ex. 37.

By spring of 2010, Unit 3509 was not the only unit that had not closed and the parties therefore began negotiating the terms of a "Master Settlement

Agreement" ("MSA") regarding all of the units with outstanding issues.[1]  In these

negotiations, Irongate insisted that the sales contracts on most units at issue --

including Unit 3509 -- be terminable at Irongate's sole discretion.  For example, on

May 31, 2010, Irongate's representative, Casey Federman, explained in an email:

> Jason [Grosfeld of Irongate] spoke with Yo [Nakano of
> Seven Signatures] this weekend and they agreed that this
> letter agreement must cover all [Seven Signatures] units
> and all units, except for the 20 listed in #4 below [which
> does not include Unit 3509], that do not close in
> accordance with the procedure specified in the purchase
> contracts (upon closing notice being given) shall
> immediately be terminable in Irongate's sole discretion in
> accordance with the purchase contracts (only to possibly
> be further amended by the provisions of this letter
> agreement or amendments to the purchase contracts).

Doc. No. 21-3, Resp't Ex. G.[2]

The parties further negotiated that for units which the resale purchaser

would obtain financing through the Irongate's mortgage lender subsidiary --

including Unit 3509 -- Irongate would delay closing until August 1, 2010 to allow

the financing to come through.  Federman's May 31, 2010 email explained:

---

[1]  As of April 2, 2010, Irongate identified sixty seven units (which did not include Unit 3509) as being in default and terminable at the sole discretion of Irongate.  *See* Doc. No. 22-7, Pet'r Ex. 40.

[2]  Irongate's Exhibit G is an email chain between, among other individuals, Casey Federman and Jason Grosfeld for Irongate, and Rosemary Fazio and Yoichiro Nakano for Seven Signatures.  As recited in his email, Federman's May 31, 2010 email provided comments in red on Fazio's May 25, 2010 emails.  The language quoted above and below ascribed to Federman is found in one of Fazio's May 25, 2010 emails.

To be clear, as you know, there is no financing
contingency in the purchase contracts and there is
certainly no obligation for (or contingency that requires)
Irongate to accommodate, arrange or provide financing to
[Seven Signatures'] resale buyers for [Seven Signatures']
back-to-back resale purchasers or to delay closings for
the same. However, for [Seven Signatures'] and their
resale buyers' comfort, Irongate will agree to delay the
scheduled closings for [Seven Signatures'] units for
which the resale buyers require financing provided that
such unit and corresponding buyer currently exist on
CalCon Mutual Mortgage's list of expected loans . . . -
we have [listed] these units below under "Prospective
[Seven Signatures] Resale Financing Buyers - CalCon".
Under no circumstances does Irongate expect for such a
closing to be scheduled later than August 1, 2010 and this
accommodation will be granted to [Seven Signatures]
only for such units that have a resale purchaser who is
currently actively working in good faith with CalCon
with the intent to close and without any delays or stalling.

*Id.*

Closing did not, however, occur by August 1, 2010 as demanded by

Irongate, and the parties subsequently scheduled the Closing Date for Unit 3509

for September 15, 2010. *See* Doc. No. 11-4, Resp't Ex. C (August 20, 2010 letter

scheduling Closing Date); Doc. No. 21-7, Resp't Ex. K. In determining this

Closing Date, Irongate stressed that it "may or may NOT allow more time for a

closing, in its sole discretion. [W]e suggest that all buyers and their agents move

quickly towards getting their mortgages or closing with cash." Doc. No. 21-7,

Resp't Ex. K.

After Seven Signatures indicated that it still could not close on Unit 3509 by September 15, 2010, Irongate allowed Seven Signatures additional time to close on Unit 3509 (as well as other units), but expected the Closing Date to occur no later than September 30, 2010. *See* Doc. No. 11-1, Grosfeld Aff. ¶¶ 12-13. Indeed, drafts of the MSA exchanged prior to September 15, 2010 contemplated that closing for Unit 3509 (and over twenty other units) would occur on September 30, 2010, *see* Doc. Nos. 21-8, -9, Resp't Exs. L, M, and the parties were finalizing the MSA by September 13, 2010. Doc. No. 21-10, Resp't Ex. N. As of September 30, 2010, Unit 3509 did not close. *See* Doc. No. 11-1, Grosfeld Aff. ¶ 15.

### 3. *The MSA*

On October 5, 2010, the parties entered into the MSA "of all open business issues" between Seven Signatures and Irongate. Doc. No. 11-5, Resp't Ex. D.[3] The MSA acknowledges that it supplements various agreements (called "Transaction Documents") entered into between the parties,[4] and that the MSA

---

[3] At the December 12, 2011 hearing, the parties agreed that the MSA was drafted jointly by the parties.

[4] Although the Transaction Documents listed do not include the specific sales contracts for individual units, they include, among other documents, the April 19, 2006 Purchase Rights and Transfer Agreement, which governs the overall sale of units to Seven Signatures. This April 19, 2006 agreement specifically lists Unit 3509 as one of the units to be purchased by Seven Signatures. *See* Doc. No. 21-11, Purchase Rights and Transfer Agreement Ex. D.

shall control "[t]o the extent that [the MSA] conflicts with the Transaction Documents." *Id.* at 1.

The finalized MSA provides:

1.    Status of Unsold Units.  Except as provided herein, Seven Signatures acknowledges that all units in the Property under contract for purchase by Seven Signatures as the buyer that are not ready to close are in default at this time and, therefore, the contracts for those units are terminable at the sole discretion of Irongate.

Provided, however, that Seven Signatures confirms that the following eleven (11) units (the "Returned Units") will not close and will be returned to Irongate: (1) 1008, (2) 1009, (3) 1016, (4) 1416, (5) 1812, (6) 2001, (7) 2120, (8) 2306, (9) 2309, (10) 2310, and (11) PH B. The contracts for these Returned Units are terminable upon acceptance of this Agreement.

Seven Signatures acknowledges that there is no financing contingency in the purchase contract or an obligation on behalf of Irongate or any of its affiliates to accommodate, arrange or provide for mortgage financing or due to lack of mortgage financing.  Notwithstanding the foregoing, and subject to the "Accommodation Fee" referenced in section 5(e) below, Irongate will agree to allow adequate time in scheduling the closings for Seven Signatures' units for which its resale buyers require financing provided that such units and corresponding buyers currently exist on BW Mortgage LLC's tracking list of possible loans or can show satisfactory evidence of an approval or "pre-approval" for mortgage financing from another lender.  BW Mortgage LLC is a wholly owned subsidiary of Irongate.  As of the date hereof the following twenty-eight (28) units on BW Mortgage LLC's tracking list include . . . (27) 3509 . . . .  This

closing scheduling accommodation only applies on a unit
by unit basis if each corresponding resale buyer
continues to act diligently in providing all reasonably
requested documents to BW Mortgage LLC and
otherwise acts with clear intent to close without delay.
Irongate does not anticipate that any of these closings
will occur later than September 30, 2010, which date
Irongate may change in its sole discretion. Nothing
contained herein shall be construed as a promise to
provide for, arrange or accommodate financing for any
Seven Signatures units.

2. <u>The "Forbearance Period" & "Forbearance Units"</u>.
Irongate agrees to forbear from terminating the contracts
of up to twenty (20) units (which are listed in Exhibit A)
(collectively, the "Forbearance Units") until the earlier of
(a) forty-five (45) days after fifteen (15) Japanese
national buyers close on the purchase of units with Seven
Signatures, with financing; or (b) December 15, 2010
(the "Forbearance Period").[5]

Doc. No. 11-5, Resp't Ex. D ¶¶ 1-2. The MSA further provides that if a contract

on any unit is terminated, then "Irongate will refund Seven Signatures four percent

(4%) of the original purchase/contract price (on a per unit basis) within thirty-five

(35) days from the termination of such contract. . . ." *Id.* ¶ 3.

Finally, the MSA provides:

12. <u>Hawaii Law and Jurisdiction</u>. This Agreement shall
be governed by the laws of the State of Hawaii, and any
dispute regarding its contents is subject to the exclusive
jurisdiction of the state or federal courts located within

---

[5] Unit 3509 is not listed as a Forbearance Unit.

> the State of Hawaii.
>
> . . .
>
> 14. <u>Complete Agreement</u>.  This Agreement supersedes any prior communications and agreements with regard to the resolution of the issues addressed herein, and may not be amended except in writing signed by each party to this Agreement.

Doc. No. 11-5, Resp't Ex. D at 6 ¶¶ 12, 14.

### 4. *Post-MSA Events*

After the parties entered into the MSA, Seven Signatures worked with Mr. Shintaku to assemble the necessary paperwork for closing, *see* Doc. Nos. 15-14-15, Pet'r Exs. 13, 14, and on October 12, 2010, Mr. Shintaku notified Irongate that he wished to accept the financing being offered through BW Mortgage.  Doc. No. 15-1, Nakano Decl. ¶ 33.

On November 19, 2010, Irongate notified Seven Signatures via letter that because Unit 3509 "is still not ready or able to close," Irongate "has terminated the Sales Contract, pursuant to Section D.37 of the Sales Contract." Doc. No. 11-6, Resp't Ex. E.  Despite this purported termination, on November 21, 2010, Mr. Shintaku provided documents to facilitate closing on Unit 3509, Doc. No. 11-7, Resp't Ex. F, and the parties continued to exchange various documents necessary for closing.  *See, e.g.*, Doc. Nos. 15-15-22, Pet'r Exs. 14-21.  Irongate also scheduled Closing Dates -- first on December 22, 2010, Doc. No. 15-24, Pet'r

Ex. 23, and then on January 6, 2011 after closing failed to take place on December 22, 2010 and after Seven Signatures notified Irongate that it was "ready, willing and able to close" on Unit 3509 and that Irongate would be in breach of the MSA if it terminated the Sales Contract. Doc. Nos. 15-26-27, Pet'r Exs. 26-27. On January 6, 2011, closing did not occur -- the lender refused to release funds until Seven Signatures resolved the dispute regarding whether Irongate had terminated the Sales Contract. Doc. No. 15-1, Nakano Decl. ¶ 54.

On January 7, 2011, Irongate tendered four percent of the Unit 3509 contract price ($116,378.60) to Seven Signatures as required for termination. *See* Doc. No. 11-1, Grosfeld Aff. ¶ 20.[6]

On April 11, 2011, Seven Signatures invoked its right to good faith negotiations under the ADR Clause of the Sales Contract. Doc. No. 15-8, Pet'r Ex. 7. Although Seven Signatures attempted to schedule good faith negotiations, Irongate refused to commit on a date to meet, Doc. Nos. 15-9-10, Pet'r Exs. 8-9, and ultimately took the position that it would agree to mediate only if mediation

---

[6] Seven Signatures did not realize that this amount was for Unit 3509 -- Irongate wired this amount to Seven Signature's bank account with no description of what the credit was for, *see* Doc. No. 15-33, Pet'r Ex. 32, and the parties had previously discussed termination amounts for other units without mention of Unit 3509. *See* Doc. Nos. 15-30-31, Pet'r Exs. 29-30, Seven Signatures learned this amount was for Unit 3509 when reviewing Irongate's Motion to Dismiss and/or for Summary Judgment, Doc. No. 15-1, Nakano Decl. ¶ 19, and has since attempted to return the $116,378.60 (Irongate has refused to accept the funds). *See* Doc. Nos. 15-34-35, Pet'r Exs. 33-34.

included itself, Seven Signatures, and Mr. Shintaku, as opposed to only Irongate and Seven Signatures.  *See* Doc. No. 15-12, Pet'r Ex. 11.

**B.      Procedural Background**

On July 22, 2011, Seven Signatures filed its Petition in the First Circuit Court of the State of Hawaii.  On August 17, 2011, Irongate removed the Petition to this court.

On September 21, 2011, Seven Signatures filed its Motion to Compel Arbitration.  On October 11, 2011, Irongate filed its Motion to Dismiss and/or for Summary Judgment.  Seven Signatures filed its Opposition to Irongate's Motion on November 18, 2011, and Irongate filed its Opposition to Seven Signatures' Motion on November 21, 2011.  Replies were filed by Seven Signatures and Irongate on November 22 and 28, 2011, respectively.  A hearing was held on December 12, 2011.  The parties provided supplemental briefing on December 23, 2011.

///

///

///

///

# III. STANDARDS OF REVIEW

## A.    Motion to Compel Arbitration

Hawaii has adopted the Uniform Arbitration Act, Hawaii Revised Statutes ("HRS") Ch. 658A,[7] which provides that an agreement to arbitrate a controversy existing between the parties is "valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract."  HRS § 658A-6(a); *see also Metzler Contracting Co. v. Stephens*, 2007 WL 1977732, at *3 (D. Haw. July 3, 2007) (acknowledging Hawaii's "strong public policy in favor of arbitration").  Where one party refuses to arbitrate, the other party may bring a motion "showing an agreement to arbitrate and alleging another person's refusal to arbitrate pursuant to the agreement," and "the court shall proceed summarily to decide the issue and order the parties to arbitrate unless it finds that there is no enforceable agreement to arbitrate."  HRS § 658A-7(a)(2); *see also* HRS § 658A-5 (stating that a party seeking relief under Ch. 658A may bring a motion).

When presented with a motion to compel arbitration, "the court shall decide whether an agreement to arbitrate exists or a controversy is subject to an

---

[7]  The parties' dispute is governed by HRS Ch. 658A, as opposed to the Federal Arbitration Act, given that the contract(s) at issue do not involve a transaction in interstate commerce.  *See* 9 U.S.C. § 2.  At the December 12, 2011 hearing, the parties agreed that Hawaii law applies.

agreement to arbitrate."  HRS § 658A-6(b).  "[T]he court is limited to answering

two questions: 1) whether an arbitration agreement exists between the parties; and

2) if so, whether the subject matter of the dispute is arbitrable under such

agreement."  *Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n, Inc*., 113 Haw. 77, 91,

148 P.3d 1179, 1193 (2006) (quoting *Koolau Radiology, Inc. v. Queen's Med. Ctr*.,

73 Haw. 433, 445, 834 P.2d 1294, 1300 (1992)); *see also Luke v. Gentry Realty,

Ltd.*, 105 Haw. 241, 247, 96 P.3d 261, 267 (2004)  ("Even though arbitration has a

favored place, there still must be an underlying agreement between the parties to

arbitrate." (citation and quotation signals omitted.)).

## B.    Summary Judgment

Summary judgment is proper where there is no genuine issue of

material fact and the moving party is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(a).  The burden initially lies with the moving party to show that there

is no genuine issue of material fact.  *See Soremekun v. Thrifty Payless, Inc.*, 509

F.3d 978, 984 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986)).  If the moving party carries its burden, the nonmoving party "must do

more than simply show that there is some metaphysical doubt as to the material

facts [and] come forward with specific facts showing that there is a *genuine issue

for trial*."  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87

(1986) (citation and internal quotation signals omitted).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## IV. <u>ANALYSIS</u>

To determine whether Seven Signatures is entitled to arbitration, the court must first decide whether the Sales Contract or the MSA applies to the parties' dispute. If the MSA applies, then the dispute is "subject to the exclusive jurisdiction of the state or federal courts located within the State of Hawaii." Doc. No. 11-5, Resp't Ex. D at 6 ¶ 12. If the Sales Contract applies, then the dispute is subject to arbitration unless it involves a claim arising out of or incident to the Sales Contract "that is raised or otherwise asserted before the Closing Date." Doc. No. 11-2, Resp't Ex. A, ¶ 39(a).

Not surprisingly, the parties dispute whether Irongate's termination of the Sales Contract is governed by the Sales Contract (and thus potentially subject

to arbitration),[8] or by the MSA (which provides that disputes are not subject to arbitration). Specifically, Irongate argues that pursuant to the MSA (which supersedes prior agreements "with regard to the resolution of the issues addressed herein"), the parties agreed that the Sales Contract was in default and terminable at Irongate's sole discretion such that any dispute over Irongate's termination is subject to the MSA's provision placing disputes before the Hawaii courts and not an arbitrator. In contrast, Seven Signatures argues that the parties never agreed in the MSA that the Sales Contract was in default such that all of the provisions of the Sales Contract are in effect, including the ADR clause.

Thus, the parties' dispute boils down to this one issue -- did the parties agree in the MSA that the Sales Contract for Unit 3509 was in default and terminable at Irongate's sole discretion such that the MSA's termination and Hawaii law provisions supersede the Sales Contract's arbitration clause? The court first outlines relevant principles of contract interpretation, and then applies those principles to these facts.

### 1. *Contract Interpretation Principles*

In determining which agreement governs Irongate's termination of the

---

[8] Irongate argues that in the event that the court finds that Irongate's termination of the Sales Contract is governed by the Sales Contract, then termination occurred prior to a Closing Date such that the parties' dispute is not subject to arbitration. In light of the analysis below, the court need not reach this alternative argument.

Sales Contract, the court applies Hawaii contract law principles.  *See, e.g.*, *Metzler Contracting Co.*, 2007 WL 1977732, at *3.  The "court's principal objective is to ascertain and effectuate the intention of the parties as manifested by the contract in its entirety.  If there is any doubt, the interpretation which most reasonably reflects the intent of the parties must be chosen."  *Brown v. KFC Nat'l Mgmt. Co.*, 82 Haw. 226, 240, 921 P.2d 146, 160 (1996) (quoting *Univ. of Haw. Prof'l Assembly v. Univ. of Haw.*, 66 Haw. 214, 219, 659 P.2d 720, 724 (1983)); *see also Wayland Lum Constr., Inc. v. Kaneshige*, 90 Haw. 417, 422, 978 P.2d 855, 860 (1999) ("An arbitration agreement, like any contract, must be construed to give effect to the intention of the parties." (citations omitted)).

> In interpreting a contract,
>
> > it is well-settled that "courts should not draw inferences from a contract regarding the parties' intent when the contract is definite and unambiguous.  In fact, contractual terms should be interpreted according to their plain, ordinary meaning and accepted use in common speech. The court should look no further than the four corners of the document to determine whether an ambiguity exists."

*Williams v. Aona*, 121 Haw. 1, 15, 210 P.3d 501, 515 (2009) (quoting *United Pub. Workers, AFSCME, Local 646, AFL-CIO v. Dawson Int'l, Inc.*, 113 Haw. 127, 140, 149 P.3d 495, 508 (2006)); *see also Brown*, 82 Haw. at 240, 921 P.2d at 160 (quoting *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 108, 839 P.2d

10, 24 (1992)). "Where there is an ambiguity, [however,] parol evidence is admissible to explain the intent of the parties . . . ." *DiTullio v. Hawaiian Ins. & Guar. Co.*, 1 Haw. App. 149, 155, 616 P.2d 221, 226 (1980); *Amfac, Inc.*, 74 Haw. at 125, 839 P.2d at 31.[9]

Where the parties have entered into two agreements governing the same subject matter, the latter agreement may modify the earlier agreement.

_____

[9] The court recognizes that Hawaii law generally provides that where a contract is ambiguous, intent becomes a question for the trier of fact. *See DiTullio v. Hawaiian Ins. & Guar. Co.*, 1 Haw. App. 149, 155, 616 P.2d 221, 226 (1980). But in determining whether the parties have agreed to arbitrate, courts routinely allow and consider extrinsic evidence where the contract is ambiguous. *See, e.g.*, *ISC Holding AG v. Nobel Biocare Inv. N.V.*, 351 Fed. Appx. 480 (2d Cir. 2009) (remanding to district court for consideration of extrinsic evidence where arbitration clause is ambiguous); *Paper, Allied-Indus., Chem. & Energy Workers Int'l Union Local No. 4-2001 v. ExxonMobil Refining & Supply Co.*, 449 F.3d 616, 620 (5th Cir. 2006) ("[E]vidence of bargaining experience can be introduced only where the contract language is *ambiguous* as to arbitrability."). Having the court consider extrinsic evidence where there is ambiguity comports with Hawaii's directive that the court must summarily determine whether the parties agreed to arbitrate. *See* HRS § 658A-7(a)(2) (providing that "the court shall proceed summarily to decide the issue and order the parties to arbitrate unless it finds that there is no enforceable agreement to arbitrate").

The court provided the parties the opportunity to brief the issue of who determines ambiguity, and Seven Signatures asserts that any ambiguity must be determined not by a court or jury, but the arbitrator. Doc. No. 22, Pet'r Suppl. Br. at 4-5. The court rejects this argument as contrary to Hawaii law requiring the court to determine whether the parties entered into a unambiguous agreement to arbitrate. *Douglass v. Pflueger Haw., Inc.*, 110 Haw. 520, 531, 135 P.3d 129, 140 (2006) (providing that "to be valid and enforceable, an arbitration agreement must have the following three elements: (1) it must be in writing; (2) it must be unambiguous as to the intent to submit disputes or controversies to arbitration; and (3) there must be bilateral consideration" (citing *Brown v. KFC Nat'l Mgmt. Co.*, 82 Haw. 226, 238-40, 921 P.2d 146, 158-60 (1996)); *see also Momot v. Mastro*, 652 F.3d 982 (9th Cir. 2011) (recognizing that "gateway issues of arbitrability presumptively are reserved for the court" because parties should not be forced to arbitrate issues they have not agreed to submit to arbitration). Indeed, Seven Signatures relies upon caselaw out of this district that interprets an earlier version of the Uniform Arbitration Act than is currently enacted in Hawaii. Doc. No. 22, Pet'r Suppl. Br. at 4-5. Such caselaw is neither binding nor persuasive.

19

Specifically, "[a] modification of a contract is a change in one or more respects which introduces new elements into the details of the contract and cancels others but leaves the general purpose and effect undisturbed." *Shanghai Inv. Co., Inc. v. Alteka Co.*, 92 Haw. 482, 497, 993 P.2d 516, 531 (2000), *overruled in part on other grounds by Blair v. Ing*, 96 Haw. 327, 332, 31 P.3d 184, 188 (2001) (quoting *Int'l Bus. Lists, Inc. v. Am. Tel. & Tel. Co.*, 147 F.3d 636, 641 (7th Cir. 1998)). "The original contract generally remains in force except as modified or superseded by the new agreement." *Id.* (quoting *Scott v. Majors*, 980 P.2d 214, 218 (Utah App. 1999) (citing *Thompson v. Gjivoje*, 896 F.2d 716 (2nd Cir. 1990) ("The modification of a contract results in the establishment of a new agreement between the parties which pro tanto supplants the affected provisions of the original agreement, while leaving the balance of it intact")). Thus, "[w]hen two contracts between the same parties are only partly inconsistent, the earlier contract is superseded only to the extent of the modification or inconsistency. The consistent or unmodified portion will continue in effect." *Create 21 Chuo, Inc. v. Sw. Slopes, Inc.*, 81 Haw. App. 512, 526, 918 P.2d 1168, 1182 (1996); *see also Farrow v. Sunra Coffee, LLC*, 2006 WL 2884086, at *6 (D. Haw. Oct. 6, 2006) (explaining that question of modification can be determined as a matter of law where "the extent that the prior contract has been modified is clear from the parties' legal

writings").

## 2. *Application*

To determine whether the parties agreed in the MSA that the Sales Contract for Unit 3509 was in default and terminable at Irongate's sole discretion (thereby superseding those terms of the Sales Contract), the court first turns to the language of the MSA.

The MSA provides:

> 1.   Status of Unsold Units.  *Except as provided herein*, Seven Signatures acknowledges that all units in the Property under contract for purchase by Seven Signatures as the buyer that are not ready to close are in default at this time and, therefore, the contracts for those units are terminable at the sole discretion of Irongate.

Doc. No. 11-5, Resp't Ex. D at 2 ¶ 1 (emphasis added).  The meaning of this sentence is clear enough on its face -- it very broadly provides that except as provided elsewhere in the MSA, "all units" that are not ready to close are in default and terminable at Irongate's sole discretion.  The court therefore looks to the MSA's other provisions to determine which Units this "except as provided herein" language refers.

The parties focus their analysis on the following language immediately following the "except as provided herein" paragraph, which provides:

Provided, however, that Seven Signatures confirms that

the following eleven (11) units (the "Returned Units")
will not close and will be returned to Irongate: (1) 1008,
(2) 1009, (3) 1016, (4) 1416, (5) 1812, (6) 2001,
(7) 2120, (8) 2306, (9) 2309, (10) 2310, and (11) PH B.
The contracts for these Returned Units are terminable
upon acceptance of this Agreement.

Seven Signatures acknowledges that there is no financing
contingency in the purchase contract or an obligation on
behalf of Irongate or any of its affiliates to accommodate,
arrange or provide for mortgage financing or due to lack
of mortgage financing. Notwithstanding the foregoing,
and subject to the "Accommodation Fee" referenced in
section 5(e) below, Irongate will agree to allow adequate
time in scheduling the closings for Seven Signatures'
units for which its resale buyers require financing
provided that such units and corresponding buyers
currently exist on BW Mortgage LLC's tracking list of
possible loans or can show satisfactory evidence of an
approval or "pre-approval" for mortgage financing from
another lender. BW Mortgage LLC is a wholly owned
subsidiary of Irongate. *As of the date hereof the
following twenty-eight (28) units on BW Mortgage LLC's
tracking list include . . . (27) 3509 . . . .* This closing
scheduling accommodation only applies on a unit by unit
basis if each corresponding resale buyer continues to act
diligently in providing all reasonably requested
documents to BW Mortgage LLC and otherwise acts with
clear intent to close without delay. Irongate does not
anticipate that any of these closings will occur later than
September 30, 2010, which date Irongate may change in
its sole discretion. . . .

2. The "Forbearance Period" & "Forbearance Units".
Irongate agrees to forbear from terminating the contracts
of up to twenty (20) units (which are listed in Exhibit A)
(collectively, the "Forbearance Units") until the earlier of
(a) forty-five (45) days after fifteen (15) Japanese

national buyers close on the purchase of units with Seven
Signatures, with financing; or (b) December 15, 2010
(the "Forbearance Period").

Doc. No. 11-5, Resp't Ex. D at 2 ¶¶ 1, 2 (emphasis provided).

Although lengthy, these three paragraphs can be summarized as
follows -- the first paragraph provides that eleven "Returned Units" will not close
and will be returned to Irongate such that these contracts are terminable upon
acceptance of the MSA; the second paragraph provides that Irongate has no
obligation, but will nonetheless allow time for closing of units obtaining financing
(the "Financing Units"), including Unit 3509, so long as the resale buyers act
diligently; and the third paragraph provides that Irongate will not terminate
contracts of "Forbearance Units" until certain later events.

Based on these paragraphs, the parties present two very different
interpretations of which sales contracts are terminable at Irongate's sole discretion.
According to Irongate, "except as provided herein" refers to only the Forbearance
Units, meaning that Irongate may terminate the sales contracts of the Returned
Units and Financing Units at its sole discretion.  In comparison, Seven Signatures
argues that "except as provided herein" refers to the Returned Units and Financing
Units, and that the parties agreed that only the Forbearance Units and any *other*

units that had not yet closed were in default.[10]  The court finds that Irongate has the better argument.

Reading the paragraphs describing Returned Units, Financing Units, and Forbearance Units in context with the first provision providing the "except as provided herein" language, it appears that all units except the Forbearance Units are terminable at Irongate's sole discretion.  Specifically, the paragraph regarding Forbearance Units is the only provision in the MSA explicitly preventing Irongate from terminating those sales contracts until specific events and/or dates in the future.  As a result, the contracts for the Forbearance Units are not "terminable at the sole discretion of Irongate," and Irongate must wait for the occurrence of certain events before terminating them.  In comparison, the MSA puts no such limits on Irongate's ability to terminate the sales contracts of Returned Units or Financing Units.  Rather, Returned Units are "terminable upon acceptance of this Agreement."  As to the Financing Units, Irongate has no obligation "to accommodate, arrange or provide for financing," and the MSA reiterates that resale

---

[10]  Seven Signatures further points to Paragraph 6(a) of the MSA providing that Seven Signatures may purchase Unit 2909 and up to three additional units as supporting its interpretation.  Because Unit 2909 is neither a Returned Unit, Financing Unit, nor Forbearance Unit, Seven Signatures argues that the MSA is not limited to discussing Returned, Financing, and Forbearance Units, and that the parties may have agreed that units other than Returned, Financing, and Forbearance Units may be in default.  Although the court recognizes that the MSA is not limited to Returned, Financing, and Forbearance Units, such fact does not change that Irongate provides a more reasoned view of the MSA.

buyers must act "with clear intent to close without delay" given that Irongate may change the Closing Date in its sole discretion. Thus, a plain reading of the MSA reveals that all sales contracts for units except the Forbearance Units are in default and terminable at Irongate's sole discretion.

Although the court finds that the plain language of the MSA displays the parties' intent that the Sales Contract for Unit 3509 was in default and terminable at Irongate's sole discretion, the court further finds that even if it resorts to extrinsic evidence to resolve any ambiguity, such evidence supports Irongate's argument. Consistent with the court's interpretation of the MSA, during negotiations of the MSA Irongate insisted that the sales contracts for *all* units except the Forbearance Units were terminable at Irongate's sole discretion. In a May 31, 2010 email, Irongate's representative, Casey Federman, explained the parties' agreement on this issue:

> Jason [Grosfeld of Irongate] spoke with Yo [Nakano of Seven Signatures] this weekend and they agreed that this letter agreement must cover all [Seven Signatures] units and all units, except for the 20 listed in #4 below, that do not close in accordance with the procedure specified in the purchase contracts (upon closing notice being given) shall immediately be terminable in Irongate's sole discretion in accordance with the purchase contracts (only to possibly be further amended by the provisions of this latter agreement or amendments to the purchase contracts).

Doc. No. 21-3, Resp't Ex. G.  The twenty units referred in this email are the

Forbearance Units, which do not include Unit 3509.  This email therefore confirms

that, consistent with the court's reading of the MSA, the parties agreed that the

sales contracts for *all* units other than the Forbearance Units were in default and

terminable in Irongate's sole discretion.

In opposition, Seven Signatures argues that the MSA does not

supplement the terms of the Sales Contract because the MSA explicitly lists the

agreements that it supplements and does not list the Sales Contract.  That is, the

MSA provides that it supplements certain agreements, termed "Transaction

Documents," and that the Sales Contract for Unit 3509 is not specifically included

in this list.  *See* Doc. No. 11-5, Resp't Ex. D.  The court rejects this argument for

several reasons.

First, it is apparent that the parties chose to list in this preamble of the

MSA only the main agreements governing the overall sale of units to Seven

Signatures and not the individual sales contracts.  And those main agreements -- in

particular, the April 19, 2006 Purchase Rights and Transfer Agreement,

specifically list Unit 3509 as one of the units to be purchased by Seven Signatures.

*See* Doc. No. 21-11, Purchase Rights and Transfer Agreement Ex. D.  Indeed, the

MSA does not list *any* sales contracts in defining "Transaction Documents," even

though the MSA certainly changes the terms of at least *some* sales contracts by giving Irongate the right to terminate them in its sole discretion.

Second, read in context within the entire MSA, it does not appear that the parties intended the list of "Transaction Documents" to be limiting on the application of the MSA. The express purpose of the MSA is to settle "all open business," and the closing of Unit 3509 and the other units that had failed to close by this time were certainly "open business" issues between the parties. Further, the MSA included an integration clause providing that the MSA "supersedes any prior communications and agreements with regard to the resolution of the issues addressed herein . . . ." Doc. No. 11-5, Resp't Ex. D at 6 ¶ 14. Thus, even though the MSA lists only a handful of "Transaction Documents," the parties' intent was to have the MSA supersede *any* prior agreements regarding the issues addressed in the MSA, which includes the closing on Unit 3509. The court therefore rejects that the parties did not intend to supplement the terms of the Sales Contract through the MSA.

Seven Signatures further argues that Unit 3509 was not in default at the time of the MSA given that prior to the MSA, the Closing Date was moved several times by agreement of the parties, and that after the MSA, the parties scheduled various closing dates. *See* Doc. No. 22 at 6-8. The court rejects this

argument as well.  It is clear from the correspondence produced by the parties that Irongate was looking to close on Unit 3509, and insisted on various Closing Dates which came and went without closing ever happening.  Thus, in negotiating the MSA, Irongate stressed that *all* units that had not closed were in default, and that Irongate was providing Closing Dates for Financing Units only as an accommodation to Seven Signatures and only to the extent that the resale purchasers actively work in good faith to close without stalling.  *See, e.g.*, Doc. No. 21-3, Resp't Ex. G.  In other words, even though the parties were working on finishing the sale of Unit 3509 by scheduling various Closing Dates, the parties had agreed that the Sales Contract was in default and terminable by Irongate. Where the parties agreed that Seven Signatures was in default, that Irongate subsequently scheduled Closing Dates after the MSA is of no consequence in determining whether the present dispute is arbitrable.

In sum, the court finds that the parties agreed through the MSA that sales contracts for Financing Units, including Unit 3509, are terminable at Irongate's sole discretion.  As a result, this termination clause supersedes any contrary termination requirements in the Sales Contract and any dispute regarding Irongate's termination is subject to the MSA's recital that disputes are "subject to the exclusive jurisdiction of the state or federal courts located within the State of

Hawaii." Doc. No. 11-5, Resp't Ex. D at 6 ¶ 12.  The court therefore need not reach the parties' additional arguments regarding whether, under the Sales Contract, a "Closing Date" has occurred such that arbitration is required.  Rather, because the MSA controls, the court finds that Irongate cannot be compelled to arbitrate the parties' dispute over whether Irongate properly terminated the Sales Contract and/or whether Irongate is obligated to sell Unit 3509 to Seven Signatures.

## V.  <u>CONCLUSION</u>

Based on the above, the court GRANTS Irongate's Motion to Dismiss and/or for Summary Judgment, and DENIES Seven Signature's Motion to Compel Arbitration.  The Clerk of Court is directed to close the case file.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, January 18, 2012.



/s/ J. Michael Seabright
_____
J. Michael Seabright
United States District Judge

*Seven Signatures Gen. P'ship v. Irongate Azrep BW LLP*, Civ. No. 11-00500 JMS/RLP, Order
(1) Denying Seven Signatures General Partnership's Motion to Compel Arbitration; and
(2) Granting Respondent Irongate Azrep BW LLP's Motion to Dismiss Petition for Order
Compelling Mediation/Arbitration, Or, in the Alternative, for Summary Judgment